Anastasia P. Winslow, Esq. ID #030821989
c/o SLOWINSKI ATKINS LLP
290 W. Mt. Pleasant Ave.
Livingston, NJ 07039
Email: Winslowlawnj@gmail.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| A.W. o/b/o N.W., | : | **Civil Action No. _____** |
| Plaintiffs, | : | |
| v. | | |
| | : | |
| PRINCETON PUBLIC SCHOOLS | | <u>COMPLAINT</u> |
| BOARD OF EDUCATION AND | : | |
| MICKI CRISAFULLI, individually, and in her | | |
| official capacity as Director of Student Services, : | | |
| Defendants. | : | |
| _____x | | |

Plaintiff A.W., o/b/o the minor N.W. does allege and say:

<u>Introduction</u>

1.      Plaintiff, A.W., on behalf of her minor child N.W., brings this action against the

Princeton Public Schools Board of Education ("PPS") located at 25 Valley Road, Princeton, New

Jersey 08540, and Micki Crisafulli ("Crisafulli"), Director of Student Services with PPS, also

having her office located at 25 Valley Road, Princeton, New Jersey, pursuant to the Individuals

with Disabilities Education Act (IDEA), 20 U.S.C. 1400 et seq.,. Section 504 of the

Rehabilitation Act of 1973 (Section 504), 29 U.S.C. 794 et seq., the Americans with Disabilities

Act of 1990 (ADA), 42 U.S.C. 12101 et seq., and New Jersey state education laws including

Title 18A and N.J.A.C. 6A:14-l.l et seq.

2.     A.W. o/b/o N.W. also asserts claims herein under 42 U.S.C. 1983 ("Section 1983"), against PPS and Crisafulli for compensatory and punitive damages for violating N.W.'s constitutional rights to equal protection and due process/access to the courts due to, *inter alia*, Crisafulli's intentional, purposeful and retaliatory false statements, delay, bad faith tactics, and intentional exclusion of N.W. from public school which PPS, by is policies and practices, condoned, approved and encouraged.

3.     A.W. o/b/o N.W.  has filed a Notice of Tort Claim against PPS, Crisafulli and others asserting state law claims for, *inter alia*, fraud, misrepresentation, breach of the duty of good faith and fair dealing, and abuse of process. Said Notice of Tort Claim was filed on July 31, 2018, requiring that A.W. o/b/o N.W. wait for a period of six months from that date from asserting such claims herein.

<u>Jurisdiction and Venue</u>

4.     Jurisdiction herein over plaintiff's federal claims is conferred by 20 U.S.C. 1415(i)(3)(A), 29 U.S.C. 794 (a)(2), 28 U.S.C. 1331 and 28 U.S.C. 1343(a)(4). Supplemental jurisdiction over plaintiff's state law claims is conferred by 28 U.S.C. 1367.

5.     Venue is proper in this district under 28 U.S.C. 1391 (b).

<u>Exhaustion of Administrative Remedies and Ripeness</u>

6.     Plaintiffs have exhausted their administrative remedies via litigation of a due process petition before the Office of Administrative Law (OAL), which resulted in a final decision issued by Administrative Law Judge (ALJ) Hon. Dean J. Buono on June 20, 2018 (Exhibit A).

7.     In addition to appealing from the OAL's decision dated June 20, 2018, plaintiffs appeal herein from prior decisions rendered during the aforesaid due process proceedings (Hon. Buono, ALJ), which now have become ripe for review including (a) OAL decision of May 17, 2018, enforcing an alleged settlement "as written" by PPS in an instrument dated March 2, 2018 (Exhibit B); (b) OAL decisions dated September 18, 2018 (Exhibit C) and September 28, 2018

(Exhibit D), granting PPS's motions for partial summary disposition; and (c) OAL decisions denying motions filed by A.W. o/b/o N.W. on September 13, 2017 and February 21, 2018, without oral or written opinions, for leave to file amended due process petitions and for an adjournment to allow for gathering of evidence.

<u>Jury Demand</u>

8.     Plaintiffs demand a jury herein as to all issues triable to a jury.

<u>The Parties</u>

9.     N.W. was born in October 2003 and as of this writing is fourteen-years old.

10.     From October 1, 2004 through August 2018, N.W. resided in Princeton, NJ.

11.     N.W. has been diagnosed with, <u>inter alia</u>, generalized anxiety disorder, depression, Attention Deficit Hyperactivity Disorder (inattentive type) (ADHD), and mood disorder not otherwise specified.

12.     N.W. also has an intelligence quotient in the very superior range.

13.     N.W. is a child with a disability in need of special education and related services under the IDEA, 20 U.S.C. 1400 <u>et seq</u>.

14.     Defendant, PPS is responsible for providing a free and appropriate public education (FAPE) to children with disabilities aged 3 to 21 years old in Princeton, NJ.

15.     PPS is also a "program or activity" receiving federal assistance under Section 504.

16.     PPS is also a "public entity" under the ADA.

<u>Preliminary Statement</u>

17.     The IDEA is a broad remedial statute intended to ensure that every child with a disability receives a FAPE from his or her public school district.

18.     Under the IDEA, a school district's obligations to provide FAPE are carried out through provision of an Individualized Education Plan (IEP) to a disabled child, and under the

IDEA, each district is required to have in place an IEP for each disabled child by the start of the school year.

19.     The IEP sets forth the child's present levels of academic and functional performance, special needs, and goals, and develops states the plan and roadmap to provide special education and related services and accommodations for the disabled child to ensure that he or she will receive FAPE.

20.     The IDEA also sets forth procedural safeguards designed to ensure parents have a meaningful opportunity to participate in the IEP process and to ensure that school districts communicate with parents openly, so that parent participation is knowing and informed.

21.     The IDEA also has provisions requiring that school districts communicate with a student's teachers in developing an IEP, so the IEP can be collaboratively developed addressing the individualized needs of the disabled child.

22.     The IDEA has an enforcement mechanism provided to parents which is designed to further the IDEA's broad remedial goals, as above; in particular, where parent(s) believe that a school district has denied his or her child a FAPE, a parent is authorized under the IDEA to file a due process petition before an administrative tribunal to enforce the IDEA's provisions and ensure the child is provided with an appropriate IEP and a FAPE.

23.     In seeking to protect a child's educational rights promptly, the IDEA expressly requires that this administrative process be concluded with a due process hearing and decision on the hearing issued within 45 days following a 30-day resolution period, 34 C.F.R. 300.515(a).

24.     PPS receives millions of dollars in federal grant money every year pursuant to the aforementioned federal statutes which pursuant to said grants, PPS is required to use for the purpose of providing special education and related services to disabled children.

25.     PPS also has an annual budget of approximately $88-90 million/year.

4

26.     Yet, PPS intentionally denounced its obligations under the IDEA to provide N.W. with an IEP for years and intentionally denied her appropriate services that she needed.

27.     When A.W. o/b/o N.W sought to enforce N.W.'s rights to FAPE and an IEP by invoking the administrative process, PPS not only continued to deny N.W. an IEP and appropriate services under the IDEA, but further engaged in retaliatory conduct and bad faith practices intentionally designed to further delay and deny services to N.W. and to harass and harm N.W. , which it did.

28.     PPS abused its power and control over N.W.'s educational program given its financial position, upon which N.W.'s education depended, with coercive tactics, for example, among other things, PPS withheld educational rights, benefits and privileges in seeking to extort settlements so that it could extract waivers releasing it from all its obligations to N.W. under the IDEA.

29.     PPS further abused its power and control by, outside of the IEP process, disparaging, controlling and sabotaging N.W.'s educational program, which actions were taken in violation of the IDEA, to gain an unfair advantage to the detriment of N.W. and A.W.

30.     PPS knew, and had reason to know, that its intentional and retaliatory actions were harming N.W., an emotionally disturbed child, were exacerbating her disability and causing her to cry and be depressed, but PPS acted with intentional disregard of how its actions caused N.W. educational and significant emotional harm.

31.     PPS further abused the litigation process through dishonesty and false certifications and positions before the N.J. OAL.

32.     PPS then engaged in fraudulent, deceptive, and unfair settlement practices, which included pursuit of coercive, onerous, and unfair settlement terms, seeking to relieve itself of all obligation to N.W., in the past and into eternity.

33.     Through such tactics and deceptive and inequitable conduct, PPS forced N.W.

5

out of the PPS school district and A.W. o/b/o N.W. had no viable option but to relocate her family to another school district.

34.     Unfortunately, N.W. demonstrated great difficulty and anxiety with her transition; for example, during the first several weeks of school in her new school district, N.W. passed out at school on nearly a daily basis due to panic attacks and anxiety, which episodes also have caused her temporary paralysis.

35.     The foregoing has caused N.W. to suffer physical, educational and emotional harm, including depression, anxiety, loss of appetite, loss of sleep, and loss of educational benefits.

Detailed Facts

Background Leading to Filing of Due Process Petition in February 2017

36.     On August 27, 2015, A.W. filed an emergent due process petition against PPS seeking a placement for N.W. for middle school other than the JW middle school ("JW") pending completion of an Individualized Education Plan ("IEP") which as of then had not been offered for N.W. (A.W. o/b/o N.W. v. Princeton Public Schools and Princeton Charter School, EDS Docket No. 15303, filed August 27, 2015).

37.     In said petition, A.W. sought a placement other than J.W. due to N.W.'s emotional difficulties and trauma; for example, in January 2015, following a discussion whether N.W. would attend J.W. middleschool, N.W. cut her wrist; N.W.'s psychologist advised that sending N.W. to J.W. was "emotionally, psychologically, and therapeutically contraindicated" and would be "highly irresponsible"; and N.W.'s psychiatrist informed that sending N.W. to J.W. would create a likelihood of harm to self or others and risk N.W. developing a full post-traumatic stress disorder diagnosis.

38.     Yet, on August 31, 2015, PPS proposed an IEP for N.W. to be placed at JW.

39.     With its IEP of August 31, 2015, PPS offered no accommodations designed to protect N.W. from students she feared as having bullied her, and in fact, the PPS Child Study

Team (CST) openly stated they could not or would not offer such accommodations.

40.      When A.W. refused to send N.W. to J.W., PPS harassed the family, calling the home to inform N.W. was absent, announcing N.W.'s name on the roll call daily at school, and Crisafulli threatened truancy charges against A.W.

41.      N.W. remained homebound for September-November 24, 2015.

42.      On October 29, 2015, the parties agreed to settle the due process proceedings pursuant to which PPS placed N.W. at the28 Fusion Academy ("Fusion") for the 2015-2016 and 2016-2017 school years.

43.      Between October 29, 2015, when the parties reached a settlement, and November 17, 2015, when the Board approved the settlement, PPS demanded amendments to the settlement instrument, which A.W. assented to, and the agreement was approved by the PPS Board on or about November 17, 2015.

44.      Fusion is a private, independent, accredited school which receives students pursuant to the Naples Act and which has worked cooperatively with school districts to provide IEPs for students as to those placements.

45.      In the settlement agreement of November 17, 2015, A.W. waived N.W.'s rights to compensatory education as of October 29, 2015 only.

46.      In the settlement agreement of November 17, 2015, A.W. did not waive N.W.'s right to an IEP under the IDEA or her right to a FAPE from PPS as of October 29, 2015.

47.      On or about November 24, 2015, PPS placed N.W. at Fusion.

48.      Thereafter, PPS refused to provide N.W. with an IEP or appropriate services at Fusion including social skills services or therapy which had been recommended by PPS's own consultants in August 2015.

49.      In fact, Fusion originally had school-based counseling on N.W.'s schedule (i.e before the settlement agreement was approved by the PPS Board), but then, after PPS

7

approved the settlement, counseling was removed from N.W.'s schedule and Fusion informed this was because PPS refused to pay for it.

50.     In May 2016, A.W. formally demanded an IEP from PPS, informing PPS of concerns about N.W.'s social and emotional functioning.

51.     In June 2016, PPS convened an IEP meeting, but did not invite any of N.W.'s teachers or any professionals or individuals knowledgeable about  N.W. but instead invited PPS staff who had never met N.W.

52.     At the June 2016 IEP meeting, PPS proposed to transfer N.W. from Fusion to J.W., contrary to the parties' settlement agreement and without professional input from anyone knowledgeable about N.W., and when A.W. disagreed and requested an IEP for N.W. at Fusion, PPS refused to respond to A.W.'s communications.

53.     On August 5, 2016, plaintiffs filed a second due process petition against PPS (AW o/b/o NW v. Princeton Public Schools) (Agency Reference 2017-25013), seeking an IEP for N.W. at Fusion and services including, for example, the opportunity for N.W. to engage in extracurricular activities with non-disabled peers in-district and social skills services.

54.     PPS still refused to provide N.W. an IEP.

55.     PPS also adamantly refused to allow N.W. to engage in extra-curricular activities in-district.

56.     While refusing to allow N.W. such services or an IEP, PPS instead offered to re-evaluate N.W. for a transition from Fusion to an in-district program and $3,000 toward social skills services, stating that by the time A.W. received a hearing date from the N.J. OAL, it would be six months anyway, so she might as well accept these services than persist with her due process petition.

57.     On September 16, 2016, A.W. withdrew the August 5, 2016 due process petition with*out* prejudice, with no waivers or releases of liability.

58.     In the fall of 2016, PPS retained Dr. Sarah Woldoff to conduct the re-evaluation.

59.     On January 29, 2017, Dr. Woldoff issued a report in which she found N.W. endorsed clinically significant concerns in areas of anxiety, somatization, and withdrawal; at risk concerns for anxiety and depression; and variability in attention/concentration, perfectionist traits, low frustration tolerance, and oppositional defiant disorder.

60.     Dr. Woldoff's report also reflected that N.W. had shown enhanced anxiety during the evaluation process with concerns about her future placement.

61.     On January 29, 2017, Dr. Woldoff reported (page 5 of her report), that she had performed the Wechsler Intelligence Scale for Children, 5th Edition, upon N.W., with N.W. achieving the following scores:

| Composite | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|
| Verbal Comprehension | 133 | 99th | 123-138 | Very Superior |
| Visual Spatial | 111 | 77th | 102-118 | High Average |
| Fluid Reasoning | 103 | 58th | 96-110 | Average |
| Working Memory | 110 | 75th | 102-117 | High Average |
| Processing Speed | 119 | 90th | 108-126 | High Average |
| Full Scale IQ | 124 | 95th | 117-129 | Superior |

62. On January 29, 2017, Dr. Woldoff reported she had evaluated N.W.'s achievement with the Wechsler Individual Achievement Test- Second Edition, with the following scores obtained:

| Subtest | Standard Score | Grade Equivalent | Percentile Rank |
|---|---|---|---|
| Oral Reading Fluency | 116 | 12.2 | 86th |
| Reading Comprehension | 107 | >12.9 | 68th |
| Pseudoword Decoding | 130 | >12.9 | 98th |
| Word Reading | 124 | >12.9 | 95th |
| **Total Reading** | **125** | **-** | **95th** |

| | | | |
|---|---|---|---|
| **Basic Reading** | **132** | **-** | **98th** |
| **Reading Comp and Fluency** | **114** | **-** | **82nd** |
| Listening Comprehension | 123 | >12.9 | 94th |
| Math Problem Solving | 107 | 11.4 | 68th |
| Numerical Operations | 111 | 10.7 | 77th |
| Math Fluency Addition | 107 | 10.4 | 68th |
| Math Fluency Subtraction | 106 | 10.1 | 66th |
| Math Fluency Multiplication | 104 | 8.2 | 61st |
| **Math Fluency** | **106** | **-** | **66th** |
| **Mathematics** | **110** | **-** | **75th** |
| Sentence Composition | 138 | >12.9 | 99th |
| Sentence Combining | 135 | - | 99th |
| Sentence Building | 126 | - | 96th |
| Essay Composition | 120 | >12.9 | 91st |
| Spelling | 133 | >12.9 | 99th |
| **Written Expression** | **138** | **-** | **99th** |

63.  With regard to services, Dr. Woldoff recommended, first and foremost, that N.W. receive an IEP; that she continue to be placed at Fusion with a slow and smooth transition back into public school for *high school*; and that N.W. be permitted to engage in extra-curricular activities at PPS and attend a special or study skills course, with consideration given to peers in those classes given N.W.'s history of negative peer interactions.

64.  PPS thereafter refused to implement Dr. Woldoff's recommendations, without any just cause, excuse, or alternative professional recommendation.

65.  For example, in February 2017, PPS convened an IEP meeting, again without inviting any of N.W.'s teachers or individuals knowledgeable about N.W., and proposed as an "IEP" that N.W. take a single class at J.W. which conflicted with N.W.'s program at Fusion, with no transportation, and without considering peers in the class; which A.W. anticipated was part of a design to transfer N.W. back to J.W. for eighth grade, all contrary to Dr. Woldoff's recommendation.

66.  On February 15, 2017, A.W. filed a due process petition seeking an appropriate

IEP for the remainder of 2016-2017 and the 2017-2018 school years, implementing Dr.

Woldoff's recommendations.

PPS's Gamemanship During Due Process Proceedings to Delay and Deny N.W.'s Services,
Leading to De Facto Case Transformation from pre-Placement to Tuition Reimbursement

67.   With the due process petition of February 2017, A.W. hoped that she could obtain an

IEP for N.W. for 2017-2018 by the start of the school year (see above, ¶ 23).

68.   However, PPS purposefully and intentionally delayed the due process proceedings with

repeated adjournment and postponement requests and tactics, claiming alleged conflicting

appointments and alleged unavailability for hearing dates.

69.   PPS was successful with its delay tactic, whereby a hearing date was not even scheduled

until six months after A.W. filed her petition, and by that time, the first available hearing date

offered to A.W. was for October 4, 2017, after the start of the school year.

70.   PPS used this as an excuse to withhold an IEP from N.W.

71.   The October 29, 2015 settlement (of the prior Due Process Petition), had required

that PPS provide N.W. with an IEP for the 2017-2018 school year by April 30, 2017; in

particular, paragraphs 2-3, provided:

> 2.      Princeton Public Schools Board of Education will conduct N.W.'s
> evaluations and offer an IEP for the 2017-2018 school year by April 30, 2017.
> 3.      The IEP set forth in paragraph 2 shall be the stay-put placement for
> the 2017-2018 school year.  The parties reserve their rights to the 2017-2018
> school year, including the parent's right to challenge 2017-2018 placement.

72.   Even though PPS was court-ordered to comply with this obligation, PPS still refused to

provide an IEP to N.W.

73.   While delaying the proceedings and withholding an IEP, PPS refused to cooperate with

A.W./N.W. to take a position on what was N.W.'s stay-put placement.

74.   As to Fusion, PPS told A.W. in spring 2017 that "you need to get your daughter out of

that school immediately," though the school was recommended for N.W. by PPS's Dr. Woldoff.

75.  A.W. repeatedly demanded, orally and in writing, that PPS take a position on stay-put, as the uncertainty in N.W.'s placement was causing her anxiety, emotional distress and crying episodes; yet, PPS still refused.

76.  A.W. was thereby forced to incur the time and expense of preparing motion papers to file before the N.J. OAL on stay-put which she filed on June 7, 2017.

77.  Upon A.W.'s filing these papers, PPS immediately agreed that Fusion was "stay put" and insulted A.W. in correspondence before the N.J. OAL to harass her, claiming that A.W. should have known Fusion was stay-put as this was obvious.

78.  Still, PPS refused to offer N.W. an IEP directed to her stay-put placement.

79.  In fact, PPS made no effort to convene an IEP meeting at any time between the filing of the due process petition in February 2017, and the start of the school year in September 2017.

80.  Without an IEP and appropriate services, the school setting at Fusion was unduly restrictive for N.W.

81.  After agreeing that Fusion was "stay-put," PPS not only refused an IEP, but it then disparaged Fusion, stating before Judge Scarola in July 2017, that Fusion was a "toilet of schools" and no child should go to school there.

82.  In the spring of 2017 and through July 2017, A.W.  requested that PPS give N.W. the opportunity to participate in math and French evaluations, with accommodations for her disability, so that she might be considered a candidate to take these courses, along with her Fusion placement, as part of a transition plan to public high school, as recommended by Dr. Woldoff.

83.  However, PPS refused A.W.'s requests for accommodations in testing.

84.  Continuing through the start of the 2017-2018 school year, PPS also refused to allow N.W. to even sit for math and French AP evaluations on equal terms as extended to general education students.

85.  Instead, PPS insisted N.W. could take such tests (<u>without</u> accommodations), extended to general education students in the district, only in N.W.'s case on condition that she agreed this would be considered a "settlement" of her due process petition.

86.  PPS thereby withheld this educational opportunity from N.W., available to other students, in an unfair manner in seeking to coerce a settlement.

87.  In August 2017, PPS further submitted correspondence to the N.J. OAL, creating a lie to accuse A.W. of perjury, which was designed to harass and disparage A.W. before the N.J. OAL.

88.  In particular, PPS represented to the N.J. OAL that A.W. had placed N.W. at Fusion in September 2015 and sought tuition reimbursement (which was false), and then PPS claimed, based on this lie, that A.W. committed perjury when, in a certification, she stated that PPS placed N.W. at Fusion in November 2015 (which was true) (above, ¶¶ 42, 47).

89.  During the summer 2017, Fusion's education department approved of N.W. taking accelerated coursework for the 2017-2018 school year, in particular, ninth grade courses based, in part, on Dr. Woldoff's testing (above ¶ 65).

90.  However, on or about August 29, 2017, Crisafulli unilaterally informed Fusion's Director that PPS would <u>not</u> pay for N.W. to attend Fusion, unless N.W. attended as an eighth grader.

91.  Upon inadvertently learning of this news on August 31, 2017, N.W. became demoralized, disheartened, and oppositional about attending Fusion.

92.  By the start of the 2017-2018 school year, there was no program for N.W. to attend at

13

Fusion, because the only "program" PPS agreed to support was a list of courses unilaterally chosen by Crisafulli, even though this selection demoralized N.W. which neither A.W. nor Fusion could or would force on N.W.

93.   Still, PPS made no effort to convene an IEP meeting or offer N.W. an IEP for the 2017-2018 school year. On or about September 18, 2017, the N.J. OAL (Buono, ALJ), granted PPS's motion for summary disposition, accepting as true the allegations of Crisafulli's false certification, before A.W./N.W.'s opposition was due to be filed (Exhibit B hereto)

94.   Instead, on September 7, 2017, PPS filed a motion for summary disposition before the N.J. OAL seeking an order dismissing A.W./N.W.'s claims for denial of FAPE from October 25, 2017 through the end of the 2017 school year.

95.   In support of its summary judgment motion, Crisafulli submitted a false and unsubstantiated certification to the N.J. OAL.

96.   In support of PPS's summary judgment motion, PPS stated, under oath, that A.W. had asked for N.W. to return to district in January 2017 (false and unsubstantiated); and that PPS had complied with all terms of the settlement of November 17, 2015 (also false and unsubstantiated, as the settlement expressly required that PPS provide N.W. with an IEP at her stay put placement which PPS refused to do  (above, ¶ 71)).

97.   The N.J. OAL (Buono, ALJ) accepted as true the allegations of Crisafulli's false certification, adopted them as "findings of fact," and granted PPS's motion for summary judgment before A.W./N.W.'s opposition was due to be filed (Exhibit B hereto, decision being appealed).

98.   On September 8, 2017, A.W. hand-delivered an emergent petition to the N.J. OAL on the issue of stay-put, advising that N.W. was not in school due to the lack of an IEP and PPS's

unilateral refusal, outside the IEP process, to pay for Fusion's recommended courses.

99.  With her emergent petition, A.W. proposed that PPS (1) convene an IEP meeting to address N.W.'s courses of study, or (2) defer to Fusion's course recommendations, or alternatively, (3) support stay-put for N.W. at The Lewis School, an option that would cost PPS about $30,000 less annually than Fusion.

100.  However, PPS opposed all those options, leaving N.W. without an educational program.

101.  PPS filed opposition papers taking the position that N.W. should be forced to attend Fusion with eighth grade classes and no IEP, although Crisafulli acknowledged she was informed this would be "devastating" for N.W.

102.  To support is position, Crisafulli submitted another false certification, misrepresenting that she received correspondence from Fusion (without annexing the correspondence), which allegedly *first* proposed an eighth grade schedule, and then *thereafter*, proposed a ninth grade schedule, and further stating, by referencing an alleged email (also not supplied), that the ninth grade schedule was an error, which was knowingly false.

103.  Notably, correspondence from Fusion was not annexed to Crisafulli's certification and when A.W. later submitted an OPRA request to PPS for such correspondence (to prove Crisafulli was lying), PPS refused to disclose it.

104.  In her certification opposing the emergent, Crisafulli also created a lie based on an alleged phone conversation with Fusion's Director to wrongfully accuse A.W. of having lied to the Director (i.e., as to A.W.'s  alleged conversations with PPS).

105.  Crisafulli's sworn statement as to what A.W. allegedly said to the Fusion Director as to what A.W. allegedly said to PPS was not only false but incompetent double hearsay which PPS

improperly presented to the N.J. OAL to harass and disparage A.W, which it did.

106.  Crisafulli was aware that her dishonest conduct was causing N.W. educational and emotional harm but demonstrated an intentional disregard and deliberate indifference toward N.W. and her special needs and emotional well-being.

107.  Without an educational program provided by PPS, N.W. began auditing classes during the month of September at The Lewis School, located in Princeton, NJ, beginning on or about September 12, 2017, so N.W. would have a place to go to school as being home without a place to go to school was depressing and debilitating for N.W. (the N.J. OAL had set oral argument on the emergent petition for September 27, 2017).

108.  During the month of September 2017, as N.W. audited classes at The Lewis School, she became very attached to the school and stabilized there; the prospect of being forced to return to Fusion traumatized her, so much so that, due to worry over the outcome of the emergent hearing, she did not eat for two days.

109.  On September 26, 2017, A.W. submitted an expert report to the N.J. OAL, in support of the emergent hearing, opining that stay-put should be The Lewis School to avoid further traumatizing N.W.

110.  In response, on September 27, 2017, PPS argued before the N.J. OAL that stay-put should be Fusion and argued further that having N.W. attend Fusion as an eighth grade was "appropriate," despite its argument, before Judge Scarolo two months earlier that Fusion was a "toilet" of schools where no child should go.

111.  PPS's argument that N.W. should be forced to attend eighth grade was also contrary to its own expert's findings (above, ¶ 61-62), and Board policies (i.e, Policy No. 2464).

112.  In making these arguments before the N.J. OAL on September 27, 2017, PPS was not

pursing an educational program to benefit N.W. and did not pursue a $30,000 more expensive

private school option for N.W.'s benefit, but instead, it was engaging in gamesmanship in

seeking to avoid any financial obligation for N.W.'s education for 2017-2018, as  PPS knew

A.W., in fulfilling her parental obligations, could not and would not force N.W. to attend Fusion

where she had school refusal, no IEP, and would be emotionally traumatized.

113.  In other words, PPS argued for a placement it knew was not reasonably viable for A.W.

o/b/o N.W. so it could avoid any financial obligation for N.W.'s schooling.

114.  PPS was successful with this tactic as on September 28, 2017, the N.J. OAL accepted

PPS's position and ordered N.W. to attend "Fusion" as stay-put.

115.  A.W. was thereby coerced to support N.W.'s education for 2017-2018 at her own

expense so N.W. could go to school without being traumatized

116.  A.W. o/b/o N.W.'s due process petition was hence de facto transformed from a pre-

placement case to a tuition-reimbursement case.

117.  Yet, the N.J. OAL also rejected plaintiff's motion to amend the petition.

118.  Specifically, on September 13, 2017, A.W. had moved for leave to amend the due

process petition to raise allegations as to events taking place since February 15, 2017.

119.  However, the N.J. OAL did not rule on the motion to amend.

120.  On September 25, 2017, A.W. moved for reconsideration of the decision granting PPS

summary disposition on the ground this was decided before A.W./N.W.'s opposition papers were

even due to be filed, and she submitted a timely-filed opposition brief and certification.

121.  On September 27, 2017, the N.J. OAL granted A.W.'s motion for reconsideration.

122.  On September 28, 2017, the N.J. OAL (after granting plaintiffs' motion for

reconsideration, ¶ 104) again granted PPS summary judgment with essentially the same decision

of September 18, 2017, making minor edits as to the procedural history claiming it thought plaintiff's emergent petition was intended as a response to the motion (Exhibit C hereto, being appealed).

123.  Thus, through PPS's delay tactics, gamesmanship, and intentional withholding of educational benefits, a due process hearing was post-poned until after the start of the school year; PPS denied N.W. an IEP through the start of the school year, PPS withheld unconditional financial support for N.W.'s stay-put program to sabotage her placement, forcing A.W. to accept all financial obligation for same; and PPS procured an order of dismissal as to past violations of the IDEA based on a false certification - all pursued, intentionally, to the detriment of N.W., an emotionally-disturbed child.

<u>PPS's Inequitable and Fraudulent Settlement Practices – Fall of 2017</u>

124.  In advance of the emergent hearing on September 27, 2017, the parties and the N.J. OAL discussed settling the case in its entirety, before oral arguments were heard.

125.  Before the emergent petition was decided, PPS proposed before the ALJ that it would pay, on a monthly basis, for N.W.'s tuition to attend The Lewis School for the 2017-2018 school year, but only on condition that A.W. would:

    (a)  Release PPS from all liability for past IDEA violations, e.g., based on its failure to provide N.W. with an IEP since October 2015;
    (b)  Waive all rights to a FAPE and an IEP while N.W. was placed at The Lewis School; and
    (c)  Waive all rights in the future, for the following (2018-2019) school year, as to N.W.'s placement, which thus would have required A.W. to concede N.W. would be placed in district at the Princeton High School (PHS) the following year, and A.W. could not challenge that placement, regardless of what N.W.'s needs were at that time or what professionals might recommend.

126.  In other words, in exchange for PPS's agreement to support N.W.'s placement for 2017-2018, PPS demanded that A.W. waive N.W.'s past and future rights under the IDEA,

including her basic right to an IEP, as well as waive her rights under the law, the following year, while N.W. was placed in public school;

127.  Before the emergent petition was decided, A.W. rejected this offer.

128.  Then, as above, the emergent petition was denied and A.W. was forced to pay N.W.'s tuition in full;

129.  On October 4, 2017, there was a hearing on the merits of the due process petition.

130.  Plaintiffs' position had been compromised, however, not only on account of the financial stress of having to pay for N.W.'s tuition in full, but because, her pleadings did not claim tuition reimbursement but an IEP at Fusion (as of February 2017), and to pursue tutition reimbursement, A.W. would be required to establish that The Lewis School was "suitable" for N.W., when N.W. had only attended The Lewis School, at that point, for a few weeks;

131.  At the outset of the hearing, PPS proposed to settle the matter with even more onerous terms than proposed on September 27, 2017 and brought a detailed settlement document to the hearing.

132.  Specifically, PPS proposed that it would reimburse A.W. for tuition at The Lewis School for the 2017-2018 school year on monthly basis upon proof of attendance (although A.W. had already paid the full year in advance), and in addition, PPS required:

(a)  there would be no IEP for N.W. at The Lewis School;
(b)  the placement for the following year (2018-2019) would be PHS and A.W. would be required to waive all of N.W.'s rights as to that placement;
(c)  A.W. o/b/o N.W. needed to waive all of N.W.'s rights through the end of the school year (through June 2018), and indemnify PPS and its members; and
(d)  A.W. needed to disenroll N.W. from the district for the course of the agreement.

133.  A.W. caved to the settlement to recover the 2017-2018 tuition while contemplating that to protect N.W.'s rights and avoid further harm from PPS, she would need to move her family to another school district at the end of the school year.

134.  On October 4, 2017, A.W. signed three copies of the agreement in court but PPS did not supply her with a copy and under duress, she left without a copy;

135.  The October 4, 2017 agreement was unexecuted by PPS and subject to Board approval at its next meeting.

136.  On October 6, 2017, and repeatedly thereafter, A.W. requested that PPS provide her with a copy of the document she had signed in court;

137.  However, PPS refused to provide her with a copy of this document.

138.  On October 6, 2017, and repeatedly thereafter, A.W. also requested amendments to the settlement instrument to provide that, if something happened where N.W.'s placement were to fail, PPS would remain obligated to provide N.W. with a FAPE under the law (without this residual protection, if N.W.'s placement were to fail, given the various waivers of the settlement instrument plaintiffs not only would not be reimbursed for the $40K in tuition, but they would have no educational options for N.W. – i.e., their only option would be to try to find another private school placement (not realistic) or abruptly move to another school district mid-year, because the instrument said that N.W. was disenrolled from the district and waived all of N.W.'s future rights through the following June 2018).

139.  However, PPS refused, refusing to accept it would remain obligated for N.W.'s education should her placement fail.

140.  Frustrated by this position, A.W., as a parent having lived in the PPS District for twenty years, consulted with a PPS Board member on or about October 17, 2017; the PPS Board member advised A.W. to revoke consent if the PPS attorney did not provide her with a copy by the end of the day, as A.W. needed a copy for consent.

141.  The PPS Board member also commented that the settlement terms, particularly as to

future placement and waivers of rights, was not tolerable to a parent.

142.   On October 18, 2017, A.W. informed PPS, through its attorney, that if she did not receive a copy of the agreement by the end of the day, she would revoke consent; and separately, that if PPS would not cooperate on reasonable amendments, she would revoke consent.

143.   However, PPS promptly wrote back as follows:

> You have made representations to the court under oath that you have accepted the agreement. The board is moving forward with the settlement agreement that you stated under oath that you agreed to. There is no further negotiations [sic] and your attempts to exact further concessions which are not legal is disappointing. <u>If you revoke consent, you will not be reimbursed for Lewis school, the district will no longer negotiate with you,</u> **<u>and you will place your daughter's educational program at risk for the remainder of this school year as I doubt there will be a hearing for months</u>**.

144.   As expressly confirmed by the foregoing, PPS's policy and practice, as also demonstrated by the factual history above, was to rely upon delays in the N.J. OAL's proceedings to delay and deny services and withhold educational benefits, while seeking to extract onerous and unfair settlement terms.

145.   Due to PPS's unreasonable position and withholding of copies, A.W. revoked her consent and directly informed the Board on October 24, 2017.

146.   On October 24, 2017, the PPS Board still "approved" the revoked agreement and sought to enforce it against A.W/N.W. with the N.J. OAL.

147.   On or about November 4, 2017, the N.J. OAL issued an opinion and order that it would not enforce the October 4, 2017 settlement instrument, however, it then set a hearing date for March 2, 2018.

148.   A.W. o/b/o N.W. appealed the N.J. OAL's stay-put decision on November 8, 2017 (which is, as of this writing, pending before the N.J. District Court as Civil Action No. 3:17-cv-11432-MAS-TJB).

PPS's Misuse of the IEP Process

149.  In November 2017, PPS contacted A.W. and indicated it wanted to convene a meeting to develop an IEP for N.W. for the remainder of the 2017-2018 school year.

150.  A.W. promptly consented to the IEP meeting and requested that PPS coordinate with The Lewis School so N.W.'s actual teachers, as well as N.W. herself, could participate in the meeting.

151.  PPS, however, refused A.W.'s request.

152.  In December 2017, PPS threatened, via Crisafulli, that if A.W. did not attend the meeting despite her objection that N.W.'s teachers were not invited, it would go ahead with the meeting anyway, namely, without any of N.W.'s teachers and without a parent.

153.  In December 2017, Crisafulli also stated to A.W. that she intended to propose an "in district" program for N.W. mid-year, without any professional guidance that this might be considered appropriate.

154.  A.W. went to JW on January 17, 2017, together with Dr. Laura Skivone, Ph.D., a clinical psychologist having treated N.W. and familiar with N.W.'s strengths and weaknesses, to attend an IEP meeting.

155.  On January 17, 2017, however, PPS canceled the IEP meeting.

156.  On January 17, 207, A.W. asked the CST to share a draft IEP and/or tell her what PPS was proposing for N.W., but the CST refused.

157.  Without receiving confirmation what the CST was planning, on January 17, 2017, Dr. Skivone provided her opinion to the CST case manager, school psychologist, and speech/language therapist that if PPS was thinking of proposing to transfer N.W. to J.W. at that point, the plan would be "preposterous" and contraindicated based on N.W.'s disability.

158.  The CST then reconvened another IEP meeting on February 6, 2018, again without inviting any of N.W.'s teachers.

159.  At the February 6, 2018 IEP meeting, the CST presented A.W. with an IEP that proposed to transfer N.W. midyear to JW for an eighth grade curriculum, despite (i) Dr. Skivone's prior advice that such a plan would be "preposterous"; (ii) Dr. Woldoff's advice that N.W. should have a transition plan for attending public school for high school; (iii) the absence of any professional or other support for this proposal; and (iv) the fact that N.W. was already taking *ninth grade* and other accelerated courses at The Lewis School.

160.  At the February 6, 2018 IEP meeting, the CST confirmed that PPS refused to invite N.W.'s actual teachers to the IEP meeting because Crisafulli refused to allow this.

161.  At the February 6, 2018 IEP meeting, the CST then rejected its own proposed program involving N.W. being placed at JW for eighth grade as lacking data.

162.  Thus, PPS intentionally abused the IEP process contrary to its intended purpose, as PPS knew its IEP meeting and draft plan was not proposed as a legitimate means to provide an appropriate educational plan and services for N.W. but it was used, intentionally and improperly, as a litigation tactic and to harass A.W/N.W..

PPS's Continued Bad Faith Litigation Practices

163.  On or about December 5, 2017, PPS filed for summary judgment before the N.J. OAL seeking dismissal of plaintiff's claims for tuition reimbursement based on the argument that PPS did not receive notice (e.g., pursuant to N.J.A.C. 6A:14-2.10(b)), of an intent to seek private school reimbursement.

164.  In filing this motion before the N.J. OAL, PPS withheld from the N.J. OAL that it had, in fact, received formal notice letters on May 2, 2017 and August 31, 2017, from A.W., of an

intent to seek reimbursement pursuant to N.J.A.C. 6A:14-2.10(b)

165.  Additionally, PPS again submitted a false certification by Crisafulli in support of its motion.

166.  Among other things, in her certification, Crisafullli swore, under oath, that (a) N.W. was enrolled at The Lewis School as an eighth grader (¶ 12), (b) that in September 2017,  N.W. was placed at The Lewis School after A.W. allegedly  "reject[ed] every idea presented" as to N.W.'s placement at Fusion; and (c) PPS had no notice N.W. was attending The Lewis School;

167.  Each of the foregoing statements was false, as N.W. was attending ninth and upper level (high school) classes at The Lewis School; it was Crisafulli who had refused to cooperate or respond to A.W.'s/Fusion's attempts to resolve the dispute as to courses of study (specifically, Fusion sent Crisafulli a proposal of September 12, 2017, which could have kept N.W. in school, but Crisafulli refused to respond to that proposal and also did not mention it or attach it to her certification); and with plaintiff's emergent petition filed September 8, 2017, PPS was expressly advised that N.W. was attending The Lewis School for evaluations (on September 6, 2017 and September 13, 2017), and requested that PPS consider The Lewis School for stay put.

168.  PPS's summary disposition motion was factually and legally unsound and filed to harass A.W/N.W., which it did.

<u>PPS's Inequitable, Fraudulent and Deceptive Conduct in Enforcing a Settlement Instrument of
March 2, 2018, to Defraud A.W./N.W. and Exclude N.W. from Public School</u>

169.  A hearing was scheduled before the N.J. OAL for March 2, 2018, as to the due process petition that had been filed on February 15, 2017.

170.  On or about February 21, 2018, plaintiffs renewed their motion for leave to amend the

petition, as the N.J. OAL had not addressed the motion for leave to amend the petition that was filed on September 13, 2017.

171.  On or about February 21, 2018, with their motion for leave to amend, plaintiffs also requested an adjournment to allow them an opportunity to gather expert opinion as to N.W.'s progress at The Lewis School.

172.  At the hearing on March 2, 2018, the N.J. OAL (Buono, ALJ), denied plaintiffs' motions.

173.  At the March 2, 2018, PPS then proposed to settlement plaintiffs' due process petition by offering to reimburse A.W. for the cost of N.W.'s tuition at The Lewis School for the 2017-2018 and 2018-2019 school years.

174.  As a condition of offering such settlement terms, PPS demanded the following conditions:

> (a)  PPS acknowledged it had the obligation to provide N.W. with an IEP but refused to offer N.W. an IEP while she was a student at The Lewis School and demanded a release from this obligation (and its failure to do in the past);
>
> (b)  PPS would refuse to evaluate N.W. while she was a student at The Lewis School;
>
> (c)  N.W. needed to disenroll from the public school district for all time;
>
> (d)  PPS would be relieved of any and all further obligations for N.W. as of June 2019 (when N.W. would be fifteen years old);
>
> (e)  A.W. o/b/o N.W. needed to waive all claims against PPS not only as to all of its past violations of FAPE but also prospectively and indefinitely into the future;
>
> (f)  PPS would reimburse A.W. for the tuition that she had already paid out of pocket for the 2017-2018 school year ($42,194) within forty-five days of Board approval of the agreement; and
>
> (g) PPS would reimburse A.W. for N.W.'s tuition for 2018-2019 up to the amount of $45,000 but only in installments, on a monthly basis, upon proof of payment and attendance.

175.  A.W. did not agree to those conditions.

176.  A.W. insisted for the same reasons stated above, in paragraph 138, that A.W./N.W. needed the option to re-enroll in district.

177.  To induce A.W. to enter the settlement, PPS responded that it would agree to the provision that N.W. could be re-enrolled in public school, in district, at any time, and in such case PPS would conduct evaluations, offer an IEP and "the agreement would be void."

178.  Crisafulli, on behalf of PPS, further represented to A.W., to induce her to sign the settlement instrument, that if N.W. re-enrolled in-district, PPS would consider other placement options for N.W., which is its obligation under the IDEA.

179.  A.W. was still reluctant to agree to the settlement due to the financial burden of again carrying a debt in the amount of over $40,000 for the school year, only to be paid back in installments, whereby she would not be fully reimbursed until the following July or August.

180.  However, PPS insisted on monthly reimbursement and assured A.W. that a payment plan would be available from The Lewis School, claiming that The Lewis School has many times provided such payment plans in the past in such circumstances.

181.  A.W. then again yielded to a settlement, with the aforementioned assurances.

182.  Throughout these discussions, the PPS attorney had the draft agreement on his computer and was making edits to it, which A.W. was not privy to.

183.  A settlement instrument was printed on a court printer and copies were handed to A.W.

184.  Before signing the settlement instrument, A.W. raised, before the ALJ and all parties while in open court that she understood there was a three-day procedural safeguard under the IDEA allowing for a party to review an executed settlement instrument for any concerns and the ALJ responded, in the presence of all parties, that the IDEA did, indeed, provide for a three-day

26

review period.

185.  A.W. then signed the settlement instrument before the N.J. OAL.

186.  Within the next three days, outside the stress and constraints of the hearing, A.W. developed concerns that the instrument, as written by the PPS attorney in court, was ambiguous and could be construed inconsistently with what had been expressly promised.

187.  Particularly, A.W. developed concerns that the instrument, as drafted by PPS, could be read to state that the $42,194 lump-sum reimbursement for 2017-2018 would not be paid in 45 days, but only in installments through the end of the school year, and that it could be read to mean that all the waivers still applied should N.W. re-enroll in public school, as the instrument did not expressly state that upon public school enrollment, the waivers in the agreement would be void, as expressly promised.

188.  Such a provision was believed to be implied, and was understood as implied as was expressly promised to A.W. on March 2, 2018, for it would be unreasonable and illogical to place a disabled child in public school while the parent o/b/o the child has simultaneously waived all rights under the law as to the school district.

189.  To address those concerns, A.W. wrote to the PPS attorney on March 6, 2018, requesting clarification on those two issues; as to the waivers, A.W. wrote:

> Paragraph 4. Upon review, the terms of paragraph 4 are unclear. Specifically, petitioners objected to the request that N.W. had to disenroll from the District for the duration of the agreement. You agreed that petitioners could, if they chose, request that N.W. be re-enrolled in district and in such event, the district would provide evaluations and offer an IEP, which is stated in the agreement. However, the impact on remaining terms is not clear.  For example, you stated, expressly, that if this option were invoked, the agreement would be void. We understood this meant that as of date of re-enrollment, the agreement would no longer be in effect. However, this is not stated in the agreement. Upon review, we request that this term be included in the agreement as otherwise, it is vague as to this option of re-enrollment.

190.  To protect N.W.'s rights as to this request, A.W. further wrote to PPS:

> To preserve our rights, we are invoking 20 U.S.C. 1415 (f)(iv), to void the stipulation of settlement dated 3/2/2018 subject to these very limited requests for clarification.  Please let me know your response as soon as possible so we may work together in a cooperation fashion to amicably resolve this matter.

191.  However, PPS refused to amend the settlement instrument as per its representations on March 2, 2018.

192.  Instead, PPS represented to A.W., and assured her, that despite language in the settlement instrument, she would be paid the lump sum of $42,194 within 45 days of Board approval, as promised on March 2, 2018.

193.  PPS further represented to A.W. that as to placement and waivers, all of her concerns were "already addressed" in the settlement instrument and that N.W. was "welcome" to return to district at any time.

194.  The PPS then "Board approved" the settlement instrument on or about March 20, 2018.

195.  On March 29, 2018, PPS submitted the agreement to the N.J. OAL for court approval, representing that "consent was maintained."

196.  Later that same morning, PPS emailed A.W. and stated that she would be reimbursed only $29,525.80 in forty-five days, and the rest would be paid later, in installments, upon proof of attendance through the end of the school year, contrary to what had been expressly promised;

197.  When A.W. responded this was a fraud, PPS took the posiiton: "that was the deal".

198.  On April 3, 2018, A.W. made a formal application to the N.J. OAL, requesting that the settlement instrument submitted to the N.J. OAL on March 29, 2018, be equitably reformed prior to approval by the OAL, to provide that (1) payment for the 2017-2018 school year ($42,194) would be made within forty-five days of Board approval, and (2) should N.W. be enrolled in public school, the waivers in the agreement would be void .

28

199.  PPS did not oppose A.W.'s request for equitable reformation.

200.  Instead, on April 13, 2018, while the request was pending, PPS sent A.W. a purchase order which proposed to reimburse her the full amount ($42,194) for 2017-2018, consistent with A.W.'s request for reformation;

201.  On April 23, 2018, A.W. executed a purchase order for reimbursement;

202.  On April 24, 2018, PPS filed a motion before the N.J. OAL to enforce the instrument "as written".

203.  Given the timing of PPS's motion to enforce the settlement instrument "as written," PPS already had a calculating plan to take this action to defraud A.W. and enforce the waivers in the instrument "as written", regardless of whether N.W. enrolled in public school, upon A.W.'s execution of the purchase order;

204.  In support of its motion to enforce the agreement "as written,"  PPS argued that the settlement instrument "left no gaps whatsoever" and should be enforced "as written" ; it further falsely represented that A.W. "failed to raise an objection … prior to the Board of Education meeting" and that A.W. had "expressly agreed that the Board of Education approve the settlement as written", all of which were false.

205.  On May 17, 2018, the N.J. OAL issued a Decision (Exhibit B hereto, being appealed), enforcing the settlement instrument "as written" and "wholeheartedly disagreeing" that should N.W. be enrolled in public school, the waivers would be void.

206.  On May 29, 2018 (the Tuesday after Memorial Day), A.W. timely filed a motion for reconsideration of the decision enforcing a settlement "as written";

207.  In support of her motion for reconsideration, A.W. argued that enforcing the agreement "as written" effects a fraud that excluded N.W. from public school;

208.  In support of her motion for reconsideration, A.W. further argued that the settlement instrument of March 2, 2018, if enforced "as written" with waivers applying to public school would violate the IDEA, Section 504, public policy and be fundamentally unfair.

209.  In support of her motion for reconsideration, A.W. further argued that PPS's refusal to amend the settlement instrument, consistent with its representations, between the drafting of the instrument in court and board approval, was contrary to the parties' prior practice and expected standards of professional conduct (above, ¶ 43).

210.  With their motion, plaintiffs also requested a stay of the decision enforcing settlement so that A.W. o/b/o N.W. could pursue a stay-put placement (in Civil Action No. 3:17-cv-11432-MAS-TJB).

211.  On June 20, 2018 the N.J. OAL issued a Decision that it lacked jurisdiction to consider the motion for reconsideration and request for stay (Exhibit A hereto being appealed).

212.  PPS maintained and thereafter insisted that N.W.'s only placement option for 2018-2019 would be that based upon enforcing the settlement instrument of March 2, 2018 "as written," with all waivers in tact, even should N.W. enroll in public school.

213.  The N.J. OAL decision of June 20, 2018, denying A.W.'s request for reconsideration and a stay, was erroneous because, *inter alia*:

    a.  Any court has the inherent power to reconsider one of its own decisions when necessary to avert a fraud, mistake, inequitable conduct, and violation of public policy and federal statutes designed to protect the rights of disabled children;

    b.  The N.J. OAL had previously granted A.W.'s motion for reconsideration on September 27, 2017, re-enforcing that reconsideration motions may be entertained before the N.J. OAL (above, ¶ 121);

c.  To argue it lacked jurisdiction to consider A.W.'s motion, the N.J. OAL relied upon Dept. of Education guidance relating to decisions following due process hearings conducted pursuant to the 45-day rule (above, ¶ 23) which was neither legally binding, nor applicable;

d.  As to the inapplicability of the alleged guidance, notably, the N.J. OAL's decision of May 17, 2018, was rendered more than one year, three months after A.W. o/b/o N.W. filed their due process petition and the decision did not issue from a due process hearing but an alleged settlement and motion.

<u>COUNT ONE</u>

(IDEA Procedural Violations)

214.  Plaintiffs repeat and re-allege the aforesaid factual allegations in paragraphs 1-213, as if set forth herein at length.

215.  Based on the facts set forth herein, PPS violated N.W.'s right to FAPE by violating plaintiffs' procedural rights.

216.  PPS's procedural violations included, without limitation, failure to:

a.  provide N.W. with an IEP directed to her educational program at Fusion or at The Lewis School as required by 34 <u>C.F.R.</u> 300.146, 34 <u>C.F.R.</u> 300.323, and 34 <u>C.F.R.</u> 300.325;

b.  invite N.W.'s actual teachers to IEP meetings as required by 34 <u>C.F.R.</u> 300.321(a)(2)-(3);

c.  invite representatives from Fusion or The Lewis School to IEP meetings as required by 34 <u>C.F.R.</u> 300.325(a)(2);

d.  engage or rely upon individuals knowledgeable about N.W. in making placement and transitional planning decisions as required by 34 <u>C.F.R.</u> 300.116;

e.  accommodate N.W.'s disability with regard to testing conditions and IEP meetings to enable her participation;

f.  appropriately review N.W.'s placement and consider alternative programs and options to ensure consistency with the least restrictive environment (LRE) provisions of the IDEA, as

required by 34 <u>C.F.R.</u> 300.116(a)(b)(2);

g.  allow A.W./N.W. adequate time, and in particular, a period of at least three-days, to review PPS's drafted settlement agreements to ensure they comported with A.W./N.W.'s understanding and assent and fairly protected N.W.'s basic educational rights (as per 20 U.S.C. 1415(f)(iv), assurances provided in court, and the parties' past practice); and

h.  ensure that any alleged waiver of N.W.'s rights under the IDEA was effected with informed  consent by A.W. of such a waiver, as required by 34 C.F.R. 300.300(b).

217.   PPS's non-compliance with procedural safeguards deprived N.W. of educational benefits.

<u>COUNT TWO</u>

(IDEA Substantive Violations)

218.  Plaintiffs repeat and re-allege the aforesaid factual allegations in paragraphs 1-217, as if set forth herein at length.

219.   PPS violated N.W.'s substantive rights to FAPE as to the 2015-2016, 2016-2017, 2017-2018, and 2018-2019 school years, through its failure to provide N.W. with IEPs directed to her educational placements and programs during said years by the start of the school year and/or in advance of placement.

220.   As to the 2017-2018 school year, PPS further denied N.W. FAPE through its violation of the parties' settlement agreement which expressly required an IEP by April 20, 2017.

221.   As to the 2017-2018, PPS denied N.W. FAPE through its refusal to timely offer N.W. an educational program addressed to N.W.'s individualized special needs and which complied with the LRE provisions of the IDEA.

222.   As to the 2018-2019 school year, PPS denied N.W. FAPE through its insistence that the only program or placement available for N.W. was that based on the March 2, 2018 settlement instrument which PPS knew effected a fraud, was inequitable and/or was wrongfully enforced, in

bad faith, to effect waiver of all of N.W.'s rights in public school.

223.  Due to PPS's having failed to provide N.W. with a FAPE plaintiffs were required to incur significant costs and expenses to provide N.W. with educational programs and services, which were suitable for N.W.

224.  PPS is required to reimburse plaintiffs for all of their out-of-pocket costs for N.W.'s educational programs, placement sand services, incurred since October 29, 2015, pursuant to 20 U.S.C. § 1412(a)(10)(C)(ii).

## COUNT THREE

(Section 504 of The Rehabilitation Act of 1973, 29 U.S.C. 791 et seq, ("Section 504"))

225.  Plaintiffs incorporate by reference paragraphs 1-224, above, as if fully set forth herein.

226.  Based on the facts set forth herein, PPS discriminated against N.W. in violation of Section 504 through its denial of FAPE under the IDEA.

227.  PPS acted with deliberate indifference to N.W.'s federally protected rights and in particular, to her right to an IEP and appropriate program and placement developed in consultation with N.W.'s actual teachers.

228.  PPS did not provide N.W. with regular or special education and related aids and services that were designed to meet her individual educational needs, including her social developmental needs, as adequately as the needs of non-handicapped students are met;

229.  PPS retaliated against N.W. to deny her benefits and opportunities as a result of A.W.'s asserting her rights herein.

230.  Based on the facts set forth herein, PPS violated N.W.'s procedural and substantive rights guaranteed under Section 504, including those set forth in the United States Department of Education's implementing regulation at 34 C.F.R. §§ 104, Subpart D;

## COUNT FOUR
(Americans with Disabilities Act of 1990, 42 U.S.C. 2101 et seq (ADA))

231.   Plaintiffs incorporate by reference paragraphs 1-230, above, as if fully set forth herein.

232.   PPS has denied N.W. appropriate accommodations for her disability to afford her an equal opportunity to participate in and enjoy the benefits of a service, program or activity of PPS.

233.   Because of N.W.'s disabilities, she has been and was excluded from participation in or denied the benefits of the services, programs or activities of PPS.

234.   With flexibility and reasonable accommodations on the part of PPS, N.W. could have benefited from those services, programs or activities available to general education students but PPS refused to provide reasonable accommodations.

235.   PPS violated N.W.'s rights protected by the ADA.

## COUNT FIVE
(New Jersey Special Education Laws)

236.   Plaintiffs incorporate by reference paragraphs 1-235, above, as if fully set forth herein.

237.   Based on the facts set forth above, PPS violated N.W.'s procedural and substantive rights guaranteed under N.J.S.A. 18A:46-1, et seq., including those set forth in the New Jersey Department of Education's Special Education regulations at N.J.A.C. 6A:14-1.1, et seq. and N.J.A.C. 6A:8-3.1(a)5, as well as PPS District Board of Education Policy 2464.

## COUNT SIX
(Section 1983 Claims, 42 U.S.C. 1983 – Crisafulli )

238.   Plaintiffs incorporate by reference paragraphs 1-237 above, as if fully set forth herein.

239.   Defendant Crisafulli, as Director of Student Services for PPS, was a sole point person in the district with responsibilities for managing the aforementioned special education litigation involving N.W.

240.  Crisafulli was personally involved with, and directly responsible for, the facts and

circumstances as alleged above relating to the N.J. OAL matters involving N.W.

241.  Plaintiff N.W. has a right under the Fourteenth Amendment to the U.S. Constitution to equal protection and equal treatment in pursuit of an education as provided under State law.

242.  The conduct and actions of defendant Crisafulli under color of law were done intentionally, willfully, maliciously, with a deliberate indifference and/or with a wanton and reckless disregard for the nature and probable consequences of her acts, and was designed to and did cause specific and serious injury and emotional pain and suffering in violation of the rights of plaintiff N.W. as guaranteed under the Fourteenth Amendment to the U.S. Constitution and under 42 U.S.C. 1983.

243.  Among other things, N.W. was denied equal access to educational rights, benefits, and privileges, extended by PPS generally to other students, in violation of the Fourteenth Amendment to the U.S. Constitution arising from Crisafulli's intentional, purposeful and malicious actions, done under color of law.

244.  As a direct and proximate result of the foregoing, plaintiff N.W. was injured, educationally, emotionally, and psychologically, which also resulted in physical ailments including passing out incidents and temporary paralysis.

COUNT SIX
(Section 1983 Claims, 42 U.S.C. 1983 - Crisafulli)

245.   Plaintiffs incorporate by reference paragraphs 1-244 above, as if fully set forth herein.

246.  A.W., o/b/o N.W., has a fundamental constitutional right of access to the courts including access to the administrative tribunal authorized to resolve disputes under the IDEA.

247.  The conduct and actions of defendant Crisafulli, under color of law, were done intentionally, willfully, maliciously, with a deliberate indifference and/or with a wanton

35

and reckless disregard for the nature and probable consequences of her acts, and was designed to impede and inhibit A.W. o/b/o N.W.'s fundamental right of access to the courts.

248. Crisafulli did cause specific and serious injury and emotional pain and suffering in violation of the rights of plaintiff N.W. as guaranteed under the Fifth Amendment to the U.S. Constitution and under 42 U.S.C. 1983.

249. As a direct and proximate result of the foregoing, plaintiff N.W. was injured, physically, educationally, emotionally, and psychologically, as aforesaid.

<u>COUNT SEVEN</u>
(Section 1983 Claims, 42 U.S.C. 1983 - PPS)

250. Plaintiffs incorporate by reference paragraphs 1-249 above, as if fully set forth herein.

251. At all times relevant to this complaint defendant Board had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of Crisafulli, and were a direct and proximate cause of the damages and injuries complained of herein.

252. At all times relevant to this complaint, Defendant Board had policies, practices, customs, and usages of encouraging and/or tacitly sanctioning the violation of N.W.'s rights.

253. It was the policy and/or custom of the defendant Board to inadequately supervise Crisafulli in her mishandling of special education matters to purposefully harm and/or disadvantage special needs students in the district, thereby failing to adequately discourage constitutional violations by defendant Crisafulli.

254. Upon information and belief, at relevant times herein, the PPS Board had a policy of "willfull blindness" and "hiding its head in the sand," in that the PPS Board purposefully did

36

not seek to inform itself as to Crisafulli's handling of special education matters, including her mishandling of special education litigation carried out in the name of the PPS Board, but relied entirely upon Crisafulli's self reports as to same.

255. Likewise, at relevant times herein, the PPS Board had a policy of willfull blindness and "hiding its head in the sand," with regard to settlement of special education litigation carried out in the name of the PPS Board, relying entirely upon Crisafulli's own self reports as to same.

256. Upon information and belief, it was due to this policy and custom of willful blindness that the PPS Board "approved" a revoked settlement agreement and attempted to fraudulently enforce same against A.W./N.W., while deceptively withholding copies from A.W.

257. Upon information and belief, it was due to this policy and custom of willful blindness that the PPS Board "approved" a voided and vague settlement instrument and then, in fact, fraudulently enforced same against A.W./N.W. pursuant to a calculated scheme to fraudulently, deceptively, and inequitably effect a waiver of N.W.'s rights in public school, thereby forcing her out of the district.

258. Upon information and belief, it was due to this policy and custom of willful blindness that the PPS Board allowed, approved and encouraged Crisafullli's acts in withholding necessary educational benefits from a special needs child while using that act of withholding of benefits, coercively, to attempt to extort unfair and onerous settlement terms relieving the PPS district of all responsibility under federal law for educational the disabled child.

259. Upon information and belief, the PPS Board adopted such policies to save time and

costs, in disregard of the rights of disabled, special needs children in its district.

260.  As a result of the above described policies and customs, defendant Crisafulli believed that her intentional and retaliatory actions would not be properly monitored by supervisory staff and that her misconduct which was purposefully carried out to harm a special needs child would not be investigated or sanctioned, but would be tolerated.

261.  The wrongful policies, practices, customs and/or usages complained of herein, demonstrated deliberate indifference on the part of policymakers of the PPS Board to the constitutional rights of the plaintiff N.W. and was the direct and proximate cause of the violations of plaintiff's rights alleged herein.

COUNT EIGHT
(Attorneys' and Expert fees)

262.  Plaintiffs incorporate by reference paragraphs 1-261, above, as if fully set forth herein.

263.   Due to the facts as stated herein, plaintiffs have been required to incur costs and expenses including expert fees and attorneys' fees.

264.  Based on the facts set forth herein and the fee-shifting and cost-shifting provisions of the IDEA, Section 504, the ADA and NJ State educational laws, as well as the reasoning as espoused in Deutch & Shur, P.C. v. Roth, 284 N.J. Super. 133 (Law Div.1995), petitioner A.W. is entitled to expert fees, costs of suit and all of their counsel fees herein.

**DEMAND FOR RELIEF**

**WHEREFORE**, plaintiffs demand judgment against Defendant PPS:

1.  Reversing the decisions of the N.J. OAL dated June 20, 2018, May 17, 2018, and September 28, 2017 (granting PPS summary judgment), as well as its decisions denying plaintiffs' motions for leave to amend the due process petition;

2.  Vacating the settlement agreement of March 2, 2018;

38

3. Finding that PPS violated plaintiffs' procedural and substantive rights guaranteed under IDEA, Section 504, the ADA, and New Jersey's Special Education Law as set forth herein;

4. Granting plaintiffs a compensatory education award for all FAPE violations since October 29, 2015, including, without limitation, that PPS be required to (i) reimburse A.W. for all her out-of-pocket educational expenses and (ii) establish an education fund on behalf of N.W., to support her current educational needs and/or provide payments to N.W.' current school district, to support N.W.'s special education needs;

5. Finding that plaintiffs' are prevailing parties herein and entitled to an award of reasonable attorney's fees, expert fees and costs of suit;

6. Finding that Crisafulli violated N.W.'s rights under Section 1983, 42 U.S.C. 1983, the Fifth and Fourteenth Amendments to the U.S. Constitution, and that the PPS Board condoned, approved, and encouraged such behavior through its policies, customs, and practices;

7. Granting plaintiffs a damanes award for such violations, including both compensatory and punitive damanges; and

8. Granting such other relief as the court may deem just and proper.

Respectfully submitted,

*s/ Anastasia P. Winslow*

_____
ANASTASIA P. WINSLOW, ESQ.
609-933-1774 (cell)
winslowlawnj@gmail.com

Dated:  September 18, 2017

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter in controversy is, in part, the subject matter of an action pending before the N.J. District Court, namely, Civil Action No. 3:17-cv-11432-MAS-TJB, which is specifically directed to the question of stay-put (an appeal of the stay-put question and the NJ OAL' decision on stay-put issued September 28, 2017, referenced herein, in ¶ 148).  Aside from that matter, the subject matter herein in controversy is not the subject matter of any other action pending  in any court or of any arbitration or administrative proceeding.

Respectfully submitted,

*s/ Anastasia P. Winslow*

_____
ANASTASIA P. WINSLOW, ESQ.
609-933-1774 (cell)
winslowlawnj@gmail.com

Dated:  September 18, 2018

# EXHIBIT A



### State of New Jersey
**OFFICE OF ADMINISTRATIVE LAW**

<u>**ORDER ON PETITIONER'S**</u>
<u>**MOTION FOR RECONSIDERATION**</u>
OAL DKT. NO. EDS 03738-17
AGENCY DKT. NO. 2017-25766

**A.W. on behalf of minor child N.W.,**

    Petitioner,

          v.

**PRINCETON REGIONAL BOARD**
**OF EDUCATION,**

    Respondent.

_____

      **A.W. on behalf of N.W.**, petitioner, pro se

      **Brett E.J. Gorman**, Esquire, for respondent (Parker McCay, attorneys)

BEFORE **DEAN J. BUONO**, ALJ:

### <u>STATEMENT OF THE CASE</u>

      On May 17, 2018, I issued a final decision approving settlement. The decision was final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514 (2017) and appealable by filing a complaint and bringing a civil action either in the Law Division of

the Superior Court of New Jersey or in a district court of the United States.  20 U.S.C. §
1415(i)(2); 34 C.F.R. § 300.516 (2017).

On May 30, 2018, petitioner filed a motion for reconsideration.  On June 13,
2018, respondent filed opposition stating that a motion for reconsideration is sparingly
granted.    Respondent maintains that under N.J.A.C. 1:6A-18.3, petitioner's only
recourse is to appeal the decision to the Superior Court, or to a district court of the
United States, pursuant to 20 U.S.C. 1415(i)(2).

After careful consideration of the submissions filed above, I **CONCLUDE**
that I do not have jurisdiction to rule on a motion for reconsideration.  A motion for
reconsideration is not permitted by the Individuals with Disabilities Education Act, 20
U.S.C. 1415, et. seq., the relevant federal regulations, 34 C.F.R. Part 300, or the
relevant New Jersey Administrative Regulations, N.J.A.C. 1:6A-1.1, et. seq.

Pursuant to 20 U.S.C. 1415 and 34 C.F.R. 300.514, a decision (including a
decision approving settlement) made in a special education due process hearing in
New Jersey is final.  A final decision is appealable by filing a complaint and bringing a
civil action either in the Law Division of the Superior Court of New Jersey or in a district
court of the United States.  In determining whether Congress intended for an appeal
to be the only recourse for an aggrieved party, "the court does not simply impose
its own construction on the statute" but gives considerable weight to an agency's
construction of its statutory provision, if it is a reasonable interpretation.  Chevron,
U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-844 (1984).  The
United States Department of Education Office of Special Education Programs
(OSEP) is the federal agency charged with the administration, interpretation, and
enforcement of the IDEA.  On July 23, 2013, OSEP published an opinion letter that
addressed the issue of whether a state hearing officer has the jurisdiction to
consider a motion for reconsideration of a due process hearing.  See OSEP MEMO
13-08 and Q&A on Dispute Resolution, Question C-25, pg. 46.  The answer
provided explained that once a final decision has been issued, no motion for
reconsideration is permitted.

[I]n a one-tier system where the due process hearing is conducted by the SEA,[1] or its agent, a party does not have the right to appeal a decision to the SEA or make a motion for reconsideration.  Under 34 CFR §300.514(a), a decision made in a due process hearing conducted by the SEA is final, except that a party aggrieved by that decision may appeal the decision by bringing a civil action in any State court of competent jurisdiction or in a district court of the United States under 34 CFR §300.516.

Once a final decision has been issued, no motion for reconsideration is permissible.  However, a State can allow motions for reconsideration prior to issuing a final decision, but the final decision must be issued within the 45-day timeline or a properly extended timeline.  For example, motions for reconsideration of interim orders made during the hearing would be permissible as long as the final decision is issued within the 45-day timeline or a properly extended timeline.

There may be situations in which the final due process hearing decision contains technical or typographical errors. It is permissible for a party to request correction of such errors when the correction does not change the outcome of the hearing or substance of the final hearing decision.  This type of request does not constitute a request for reconsideration as discussed within this response.

OSEP's interpretative statement in this matter commands deference.  Therefore, this tribunal does not have the authority to hear a motion for reconsideration from a final decision in a special education due process matter brought under IDEA.

---

[1] State Education Agency

## ORDER

Based on the foregoing, I **ORDER** that petitioner's motion for reconsideration is hereby **DENIED**.

June 20, 2018
_____
DATE

**DEAN J. BUONO**, ALJ

Date Received at Agency:                    June 20, 2018

Date Sent to Parties:                       June 20, 2018

mph

- 4 -

# EXHIBIT B



## *State of New Jersey*
### OFFICE OF ADMINISTRATIVE LAW

<u>**ORDER GRANTING MOTION**</u>

OAL DKT. NO. EDS 03738-17

AGENCY DKT.NO. 2017-25766

**A.W. on behalf of minor child N.W.,**

     Petitioner,

         v.

**PRINCETON REGIONAL BOARD**

**OF EDUCATION,**

     Respondent.

_____

     **A.W. on behalf of N.W.**, petitioner, pro se

     **Brett E.J. Gorman**, Esquire, for respondent (Parker McCay, attorneys)

BEFORE **DEAN J. BUONO,** ALJ:

<u>**STATEMENT OF THE CASE**</u>

     Respondent, Princeton Public Schools Board of Education ("District") seeks an order accepting the settlement entered into and placed on the record before the undersigned on March 2, 2018.  Petitioner objects stating that there was never an agreement and the terms were evolving over time.

OAL DKT. NO. EDS 03738-17

## <u>PROCEDURAL HISTORY AND STATEMENT OF FACTS</u>

Petitioner filed a complaint for due process with the Office of Special Education Programs ("OSEP").  The complaint was filed under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. §§1400 to 1482.

I will forego the tortured procedural history and rely on the most recent events bringing rise to this application.  This case settled at the hearing in September 2017. Petitioner acknowledged, on the record, the terms of the settlement but, on the eve of the Board of Education meeting, she withdrew her consent. The Board approved the settlement. On November 2, 2017, the court issued an order rejecting the settlement setting the matter down for hearing on March 2, 2018.  At the hearing on March 2, 2018, again, the case settled. Petitioner acknowledged, on the record, the terms of the settlement.  Again, on the eve of the Board of Education meeting, she withdrew her consent. The Board approved the settlement.

After reviewing the moving papers and responses and reconsidering argument, **I FIND** as **FACT** that:

1. Princeton Public Schools Board of Education (hereinafter "District") is the local educational agency responsible for the operations of the Princeton Public School District, a prekindergarten through twelfth grade public school district.
2. A.W. is a licensed practicing attorney in the State of New Jersey.
3. N.W. is approximately thirteen years old, and is a student who currently resides within the District.
4. N.W. is eligible for special education and related services under the classification category of emotionally disturbed.
5. On August 27, 2015, petitioner filed a due process petition against the District seeking an out-of-district placement for N.W. and compensatory education.

OAL DKT. NO. EDS 03738-17

6. The aforementioned matter was resolved via settlement agreement, dated October 29, 2015.

7. The settlement agreement provided in relevant part that, at petitioner's request, N.W. would be placed at the Fusion Academy in Princeton, New Jersey for sixth grade during the 2015-2016 school year and for seventh grade during the 2016-2017 school year, and the District would pay tuition directly to the Fusion Academy for same.

8. The District complied fully with the October 29, 2015 settlement agreement.

9. In or about January 2017, A.W. contacted the District and indicated that she was considering enrolling N.W. in the District.

10. In or about February 2017, the District conducted an IEP meeting, and A.W. was in attendance. Petitioner subsequently filed a due process petition, instituting the within matter.

11. On September 7, 2017, respondent filed a motion for partial summary decision, which was granted by way of a court order entered by the undersigned. The order indicated that only issues concerning due process from July 1, 2017, forward are relevant.

12. N.W. is currently enrolled as an eighth-grade student at the Lewis School in Princeton, New Jersey.

13. N.W. was placed at the Lewis School by her parent, A.W.

14. On August 31, 2017, A.W. provided a letter to the District seeking reimbursement for private placement.

15. The District learned about N.W.'s unilateral placement at the Lewis School through an emergent relief application seeking to have the Lewis School serve as the "stay-put" placement which was denied by this court on September 27, 2017.

16. On October 4, 2017, this matter was scheduled to commence but the parties entered into a settlement agreement that was placed on the record before the court.

17. The settlement agreement provided, in relevant part, that the District shall reimburse the parent for the cost of tuition at the Lewis School for the 2017-2018 school year.

18. On October 24, 2017, the day the Board was scheduled to approve the agreement, petitioner revoked her consent to the settlement agreement.

19. Regardless, the Board, seeking to end this litigation and relying upon the statements made by petitioner on the record, approved the original agreement.

20. On November 2, 2017, the undersigned determined that petitioner's demands made prior to the Board's approval modified the settlement agreement and petitioner had effectively revoked her consent to the agreement. The court scheduled this matter for hearing on March 2, 2017. (OAL Dkt. No. EDS 03738-17)

21. On March 2, 2017, this matter was again scheduled to commence with a hearing, but the parties entered into a settlement agreement that was placed on the record before the Court.

22. There has been no mistake, fraud or any undue influence alleged by the petitioner in connection with the execution of the settlement agreement.

## ARGUMENTS OF THE PARTIES

As stated, the within matter comes before me on the Motion to Accept the Settlement between the parties.  The Board argues that it is entitled to entry of a decision in its favor settling this case as a matter of law.  The issue is whether the settlement agreement precludes re-litigation of additional demands by the petitioner after the March 2, 2017, settlement agreement.

The District argues that New Jersey has a strong public policy in favor of settlements. See Nolan v. Lee Ho, 120 N.J. 465, 472 (1990). "An agreement to settle a lawsuit is a contract which . . . may be freely entered into, and which a court, absent a demonstration of 'fraud or other compelling circumstances,' should honor and enforce as it does other contracts."  Pascarella v. Bruck, 190 N.J. Super. 118, 124-125 (App.

OAL DKT. NO. EDS 03738-17

Div. 1983).  Disputes regarding settlement agreements should be resolved by applying general principles of local contract law.  <u>Green v. John H. Lewis & Co.</u>, 436 F.2d 389, 390 (3d Cir. 1970).  In accordance with traditional principles of contract law, "parties create an enforceable contract when they agree to the essential terms and manifest an intent that the terms bind them."  <u>Baer v. Chase</u>, 392 F.3d 609, 619 (3d Cir. 2004).

The respondent correctly argues that the agreement was entered into before the Court.  It was memorialized in writing, reviewed by petitioner, read into the record, I then <u>voir</u> <u>dired</u> petitioner regarding the terms, and petitioner swore—under oath—that she consented to the agreement.  Petitioner then signed the agreement in my presence.  Respondent claims that there is no possible way that petitioner can claim that a fraud was perpetrated with respect to the agreement, or that there is any other compelling reason for this court to not accept it.  I agree.

Furthermore, when parties agree to the terms of a settlement on the record in court, a party's subsequent failure to sign the document does not even render the settlement unenforceable.  Instead, it is well-settled that "[an] agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of court, and even in the absence of a writing."  <u>Green</u>, 436 F.2d at 390; <u>see</u> <u>also</u> <u>Williams v. Vito</u>, 365 N.J. Super. 225 (Law Div. 2003).  Here, not only did the parties agree to the terms of the settlement on the record in court, but petitioner actually signed the written agreement in court.

Here, after petitioner signed and consented to the terms of the agreement, she then sought to revise it, proposing that the District send a lump sum payment of $35,000 instead of the agreed-upon $45,000 for N.W.'s education at the Lewis School.  The apparent rational was that rather than using the money for N.W.'s education, Petitioner would use the money towards "counsel fees/ compensatory damages, e.g., to be paid through the insurer . . . and [that] with such a settlement, we could move over the summer and use the compensatory damage award to pay for a rental at our new location while our house is on the market. . . ."

OAL DKT. NO. EDS 03738-17

The District responded by stating that it is only obligated to perform under the terms of the binding agreement. Counsel for the District notified petitioner that the Board of Education would vote to approve the agreement at its meeting on March 20, 2018. The District's position was made clear that the District would not agree to revise the agreement and it would be approved as written.  The petitioner failed to raise an objection to this prior to the Board of Education meeting. Apparently in fact, petitioner indicated her acceptance of the settlement after its approval through an email she sent to the District's attorney stating that she "understood the District was moving forward with the agreement," further stating "[p]lease let me know if the agreement was approved and if so, whether you need anything from me for the reimbursement. If not, please let me know how the District would like to proceed."  Thus, based on the foregoing, the binding settlement agreement approved before the court was still in effect when the Board of Education approved it.  Petitioner did not take a sufficient action to revoke consent and, rather, implicitly and expressly agreed that the Board of Education approve the settlement as written and placed on the record before the court.

It is well accepted that, as long as the parties agreed to the essential terms of the settlement, and the written agreement that a party seeks to enforce reflects these terms, the agreement is enforceable.  A plaintiff's:

> [f]ailure to execute release documents [does] not void the original agreement, nor [does] it render it deficient from the outset.  Execution of a release [is] a mere formality, not essential to the formation of the contract of settlement. "So long as the basic essentials are sufficiently definite, any gap left by the parties should not frustrate their intent to be bound."
>
> [Hagrish v. Olson, 254 N.J. Super. 133, 138 (App. Div. 1992) (quoting Berg Agency v. Sleepworld-Willingboro, Inc., 136 N.J. Super. 369, 377 (App. Div. 1975)) (emphasis added).]

Additionally, "Where a party to an agreement-in-principle suddenly changes its mind and refuses to execute the written contract without explanation, the court must enforce the  agreement." United States v. Lightman, 988  F.Supp. 448, 463 (D.N.J.1997); see e.g., Zong v. Merrill Lynch Pierce Fenner & Smith, Inc., 632 Fed.

Appx. 692, 695 (3d Cir. 2015), cert. denied, 137 S. Ct. 1812 (2017) (enforceable settlement agreement where transcript demonstrated that the opposing party explicitly agreed to material terms); Finocchiaro v. Squire Corrugated Container Corp., CIV.A.05-5154(SRC), 2008 WL 305337, at *3 (D.N.J. Jan. 28, 2008) (finding there was an enforceable agreement where parties placed terms of the agreement on the record and the opposing party agreed to those terms); United States v. Zoebisch, 2013 WL 5719246, at *2 (D.N.J. Oct. 18, 2013), aff'd, 586 Fed. Appx. 852 (3d Cir. 2014) ("As an agreement-in-principle had already been reached by the parties on February 24, 2012 [when on the record, the parties set forth material terms and agreed to them], Defendant's 'buyer's remorse' as to the terms of the settlement agreement into which he voluntarily and clearly stated his intention to enter does not justify reopening the case to permit litigation and reopen the case.").

Here, the parties agreed to the essential terms of the settlement before the Court on March 2, 2018, namely that (1) the District would reimburse the parent in an amount not to exceed $42,194.00 for 2017-2018 tuition, (2) the District would reimburse the parent in an amount not to exceed $45,000 for the 2018-2019 school year, (3) for the costs already made by petitioner for the 2017-2018 school year, the District would issue the payment in a lump sum but the remaining costs, as well as the costs for the 2018-2019 school year, will be made on a monthly basis, and all four of those payments made by the District shall be issued upon receipt of proof of payment and attendance of N.W. at the Lewis School within forty-five days of receipt of the aforementioned documentation.

The District argues that despite the clear terms agreed to, petitioner now objects to how she is to receive reimbursement for N.W.'s tuition from the District as well as the waiver language in the agreement.  It is argued that petitioner sent multiple emails to the District's attorney seeking clarification over issues that were articulated in the agreement. The District points out by way of example, petitioner asked if she would receive a lump payment "upon Board approval" rather than "upon proof of receipt and payment of attendance." These terms are clearly set forth in the relevant part of the agreement above, which states "all payments made by the District shall be issued upon

receipt of proof of payment and attendance of N.W. at the Lewis School within forty-five days of receipt of the aforementioned documentation."

The respondent is correct that "reasonable amendments just to make clear" various intricacies in language in the agreement are immaterial and do not alter the terms of the agreement.  The Settlement Agreement placed on the record leaves no gaps whatsoever.

Settlement agreements are contracts and are subject to the general rules of contract interpretation.  Blunt v. Lower Merion Sch. Dist ., 767 F.3d 247, 282 (3d Cir. 2014).  One of the specific terms contained within the written agreement, and agreed to by all parties on March 2, 2018, was that the Board of Education must formally act and approve the settlement.  Every settlement agreement that involves the payment of public funds by a Board of Education is subject to this conditional term. See City of Jersey City v. Roosevelt Stadium Marina, Inc., 210 N.J. Super. 315, 327 (App. Div. 1986), certif. denied, 110 N.J. 152 (1988) (holding "a governmental body, such as a board of education, must act by formal action . . . [when] giving consent to the settlement of litigation").  This term is considered to be a "condition."  Restatement (Second) of Contracts § 224; 13 Williston on Contracts § 38.4 (Lord ed. 2000).  In general, "parties may condition . . . one party's performance on the happening of some specified event."  Id.  New Jersey Courts have specifically found that conditional contracts are enforceable. Id.; see also Houghwout v. Boisaubin, 18 N.J. Eq. 315, 318-319 (Ch. 1867).

Respondent argues that here, the parties entered into a valid and enforceable conditional settlement agreement. The parties agreed on the essential terms and manifested an intention to be bound by those terms. Petitioner specifically agreed to the express conditional term—formal Board approval—and is, therefore, obligated to comply with the Settlement Agreement.  Petitioner's "change of mind," after the Board of Education approved the settlement, does not abrogate the fact that a "bargain clearly was struck," making this contract enforceable. See Pascarella, 190 N.J. Super. at 126.

Petitioner's "buyer's remorse" regarding a term of the agreement when she voluntarily and clearly entered into the agreement by signing it and participating in a colloquy, does not justify reopening the case to permit litigation. Petitioner's desire to receive a lump sum payment is not a compelling reason for the court to set aside a binding agreement.

Petitioner argues that the agreement was hastily drafted by the District and is vague and inconsistent as written.  Also, "there have been unanticipated changes in circumstances since March 2, 2018, impacting the future as to N.W.'s educational needs."   Finally, A.W. asks the court to approve an agreement "with equitable reformation which modifies the present draft to state that should N.W. be re-enrolled in district at any time, for any reason, (which was what was discussed during negotiations), future waiver as of that point are void and N.W. retains all rights under the IDEA, ADA, etc. . . ."  I wholeheartedly disagree.

## LEGAL ANALYSIS AND CONCLUSIONS

It is well established that if there is no genuine issue as to any material fact, a moving party is entitled to prevail as a matter of law.   Brill v. The Guardian Life Insurance Co. of America, 142 N.J. 520, 540 (1995).  The purpose of summary decision is to avoid unnecessary hearings and their concomitant burden on public resources. Under the Brill standard, a fact-finding hearing should be avoided "when the evidence is so one-sided that one party must prevail as a matter of law."  Here, **I CONCLUDE** that the legal issue of the finality of the Settlement Agreement can be determined without the necessity of evidentiary hearings.

Settlements are highly favored mechanisms in our justice system for resolving disputes between parties.   Without such amicable resolutions, the court and administrative forums would be overburdened with litigation, hearings and decisions and would grind to a halt.   "For nearly forty-five years, New Jersey courts have found that the '[s]ettlement of litigation ranks high in [the] public policy' of this State.'  Nolan ex rel. Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (quoting Jannarone v. W.T. Co., 65 N.J.

OAL DRT. NO. EDS 03738-17

Super. 472, 476 (App. Div.), <u>certif. denied</u>, 35 <u>N.J.</u> 61 (1961)).”  <u>Puder v. Buechel</u>, 183 N.J. 428, 437-38 (2005).  The goal of this policy is “the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone.”  <u>Dep't of Pub. Advocate v. Bd. of Public Util.</u>, 206 N.J. Super. 523, 528 (App. Div. 1985).  Accordingly, I am required to give effect to the parties' settlement whenever such is consistent with the terms and the law.

Here, **I FURTHER CONCLUDE** that the Settlement Agreement is clear and unambiguous on its face.  It can only be interpreted in one manner. The Settlement Agreement is not susceptible of any other reading and must be enforced as it was written.  This agreement was entered into before the court.  It was memorialized in writing, reviewed by petitioner, read into the record, and I then <u>voir dired</u> petitioner regarding its terms. Petitioner swore—under oath—that she consented to the agreement.  Petitioner then signed the agreement in my presence.  Respondent claims that there is no possible way that petitioner can claim that a fraud was perpetrated with respect to the agreement, nor that there is any other compelling reason for this Court to not accept it.  It is further noted that one very important fact is that the petitioner is a licensed practicing lawyer in the State of New Jersey and has more familiarity and training with contracts and settlements that your average lay litigant.  In fact, by her own admission, she is “schooled in the fundamentals of contract law.”

I agree with the Board and **FURTHER CONCLUDE** that petitioner got the bargain of the Settlement Agreement.  A settlement “freely entered into” can only be set aside for fraud or other compelling circumstances.  <u>Jennings v. Reed</u>, 381 N.J. Super. 217, 226-27 (App. Div. 2005).  The party seeking the extraordinary remedy of reopening a case or issues previously resolved by a voluntary settlement agreement must demonstrate by clear and convincing proof that the agreement was the result of fraud, undue influence or duress, or mutual mistake as to a material fact.  A settlement cannot be voided or avoided simply because a party later determines that maybe they could get a better deal, or in this case, recoupment of counsel fees.  Any attempt to have it set aside is a burden petitioner has not carried in these proceedings.  They have

OAL DKT. NO. EDS 03738-17

asserted no fraud, undue influence or mutual mistake to entitle them to set aside the agreement.

<u>**ORDER**</u>

Based on the foregoing, it is **ORDERED** that the Board's motion is hereby **GRANTED.**

May 17, 2018_____
DATE                                                  **DEAN J. BUONO**, ALJ

/dw/mph

# EXHIBIT C



*State of New Jersey*
OFFICE OF ADMINISTRATIVE LAW

<u>**ORDER GRANTING PARTIAL**</u>
<u>**SUMMARY DECISION**</u>
OAL DKT. NO. EDS 03738-17
AGENCY DKT. NO. 2017-2576

**A.W. on behalf of minor child N.W.,**
 Petitioner,
   v.
**PRINCETON REGIONAL BOARD**
**OF EDUCATION,**
 Respondent.

_____

  **A.W. on behalf of N.W., petitioner,** <u>pro</u> <u>se</u>

  **Brett E.J. Gorman**, Esq., for respondent (Parker McCay, attorneys)

BEFORE **DEAN J. BUONO,** ALJ:

<u>**STATEMENT OF THE CASE**</u>

  Respondent brings a motion for partial summary decision on the issue that any discussion of claims for the 2016-2017 school year are moot as they were addressed in the October 29, 2015, Settlement Agreement and only issues concerning due process from July 1, 2017, forward are relevant.

OAL DKT. NO. EDS 03738-17

## PROCEDURAL HISTORY

 Petitioner filed a complaint for due process with the Office of Special Education Programs (OSEP).   The complaint was filed under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§1400 to 1482.

On September 7, 2017, respondent filed their motion for partial summary decision.  On September 11, 2017, petitioner filed an emergent relief application directly with the Office of Administrative Law (OAL).  A hearing is currently scheduled for October 4, 2017.

## STATEMENT OF FACTS

The following facts have been uncontested by petitioner and as such **I FIND** as **FACT** that:

1.     Princeton Public Schools Board of Education (hereinafter "Board") is the local educational agency responsible for the operations of the Princeton Public School District, a prekindergarten through twelfth grade public school district.

2.     N.W. is approximately thirteen years old, and is a student who resides within the District.

3.     From September 2010, through September 2012, and then from April 2014, through the present, N.W. was enrolled in the District.

4.     N.W. is eligible for special education and related services under the classification category of emotionally disturbed.

5.      N.W. is currently enrolled as a rising eighth grade student at the Fusion Academy in Princeton, New Jersey.

6.      On August 27, 2015, petitioner filed a due process petition against the District seeking an out-of-district placement for N.W. and compensatory education.

7.      The aforementioned matter was resolved via the Settlement Agreement dated October 29, 2015.

8.      The Settlement Agreement provides, in relevant part, that, at petitioner's request, N.W. would be placed at the Fusion Academy in Princeton, New Jersey for sixth grade during the 2015-2016 school year and for seventh grade during the 2016-2017 school year, and the District would pay tuition directly to the Fusion Academy for same.

9.      N.W. attended the Fusion Academy through June 2017, and the District provided tuition to the Fusion Academy through June 2017, in accordance with the Settlement Agreement.

10.     In or about January 2017, petitioner A.W. contacted the District and indicated that she was considering enrolling N.W. in the District.

11.     In or about February 2017, the District conducted an IEP meeting, which A.W. attended.   Petitioner subsequently filed a due process petition, instituting the within matter.

12.     Petitioner has made no requests for services at the Fusion Academy that have been rejected by the District.

OAL DRT. NO. EDS 03738-17

13.     With respect to any and all claims made by petitioner through July 1, 2017, the District acted in accordance with the settlement agreement.

## LEGAL DISCUSSION

Pursuant to N.J.A.C. 1:1-12.5(b), a summary decision "may be rendered if the papers and discovery which have been filed, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law." This rule is substantially similar to the summary judgment rule embodied in the New Jersey Court Rules, R. 4:46-2. See Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74 (1954). In connection therewith, all inferences of doubt are drawn against the movant and in favor of the party against whom the motion is directed. Id. at 75. In Brill v. Guardian Life Insurance Co., 142 N.J. 520 (1995), the New Jersey Supreme Court addressed the appropriate test to be employed in determining the motion:

> [A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party. The "judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial".
>
> [Brill, supra, 142 N.J. at 540 (citations omitted).]

Petitioner has not argued anything that establishes an issue of fact on this very narrow issue. As such, having reviewed the parties' submissions and argument in support of, and opposition to, the within motion for summary decision, **I CONCLUDE** that no issues of material fact exist regarding claims for the 2016-2017 school year and as a result are moot as they were addressed in the October 29, 2015, Settlement Agreement and only issues concerning due process from July 1, 2017 forward are relevant.

OAL DKT. NO. EDS 03738-17

## <u>ORDER</u>

It is **ORDERED** that the respondent's motion for partial summary decision be and hereby is **GRANTED.**   It is **FURTHER ORDERED** that this matter be heard on the merits at a hearing on October 4, 2017.

September 18, 2017
DATE                                              **DEAN J. BUONO,** ALJ

dlw/mph

# EXHIBIT D

1



### *State of New Jersey*
OFFICE OF ADMINISTRATIVE LAW

**ORDER GRANTING PARTIAL**

**SUMMARY DECISION**

OAL DKT. NO. EDS 03738-17

AGENCY DKT. NO. 2017-2576

**A.W. on behalf of minor child N.W.,**

    Petitioner,

        v.

**PRINCETON REGIONAL BOARD**

**OF EDUCATION,**

    Respondent.

_____

      **A.W. on behalf of N.W.**, petitioner, pro se

      **Brett E.J. Gorman**, Esquire, for respondent (Parker McCay, attorneys)

BEFORE **DEAN J. BUONO,** ALJ:

### STATEMENT OF THE CASE

      Respondent brings a motion for partial summary decision on the issue that any discussion of claims for the 2016-2017 school year are moot as they were addressed in the October 29, 2015, Settlement Agreement and only issues concerning due process from July 1, 2017, forward are relevant.

## PROCEDURAL HISTORY

Petitioner filed a complaint for due process with the Office of Special Education Programs (OSEP).  The complaint was filed under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§1400 to 1482.

On September 7, 2017, respondent filed their motion for partial summary decision.  On September 11, 2017, petitioner filed an emergent relief application directly with the Office of Administrative Law (OAL).  The decision on the motion was tendered on September 18, 2017, with the thought that the response was the emergent application.  On September 25, 2017, a Motion for Reconsideration was filed by A.W. and a letter of representation was filed by Denise Lanchantin Dwyer, Esquire.  Oral argument on all motions and the emergent was heard on September 27, 2017.  Due to the impeding hearing date, the undersigned orally granted A.W.'s Motion for Reconsideration.  At the conclusion of the oral argument, Ms. Lanchantin Dwyer made it clear that she was only representing petitioner on the emergent relief application.  A hearing is currently scheduled for October 4, 2017.

## STATEMENT OF FACTS

After reviewing the moving papers and responses and reconsidering argument, **I FIND** as **FACT** that:

1.     Princeton Public Schools Board of Education (hereinafter "Board") is the local educational agency responsible for the operations of the Princeton Public School District, a pre-kindergarten through twelfth grade public school district.

2.     N.W. is approximately thirteen years old, and is a student who resides within the District.

3.     From September 2010, through September 2012, and then from April 2014, through the present, N.W. was enrolled in the District.

4.     N.W. is eligible for special education and related services under the classification category of emotionally disturbed.

5.    N.W. is currently enrolled as a rising eighth grade student at the Fusion Academy in Princeton, New Jersey.

6.    On August 27, 2015, petitioner filed a due process petition against the District seeking an out-of-district placement for N.W. and compensatory education.

7.    The aforementioned matter was resolved via the Settlement Agreement dated October 29, 2015.

8.    The settlement agreement provides, in relevant part, that, at petitioner's request, N.W. would be placed at the Fusion Academy in Princeton, New Jersey for sixth grade during the 2015-2016 school year and for seventh grade during the 2016-2017 school year, and the District would pay tuition directly to the Fusion Academy for same.

9.    N.W. attended the Fusion Academy through June 2017, and the District provided tuition to the Fusion Academy through June 2017, in accordance with the Settlement Agreement.

10.    In or about January 2017, petitioner A.W. contacted the District and indicated that she was considering enrolling N.W. in the District.

11.    In or about February 2017, the District conducted an IEP meeting, which A.W. attended.   Petitioner subsequently filed a due process petition, instituting the within matter.

12.    Petitioner has made no requests for services at the Fusion Academy that have been rejected by the District.

13.    With respect to any and all claims made by petitioner through July 1, 2017, the District acted in accordance with the Settlement Agreement.


## **LEGAL DISCUSSION**


Pursuant to N.J.A.C. 1:1-12.5(b), a summary decision "may be rendered if the papers and discovery which have been filed, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law."  This rule is substantially similar to the summary judgment rule embodied in the New Jersey Court Rules, R. 4:46-2.  See Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74 (1954).  In connection therewith, all inferences of doubt are drawn against the movant and in favor of the party

against whom the motion is directed.  <u>Id.</u> at 75.  In <u>Brill v. Guardian Life Insurance Co.</u>, 142 <u>N.J.</u> 520 (1995), the New Jersey Supreme Court addressed the appropriate test to be employed in determining the motion:

> [A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party.  The "judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial".
>
> [<u>Brill</u>, <u>supra</u>, 142 <u>N.J.</u> at 540 (citations omitted).]

Petitioner still has not argued anything that establishes an identifiable issue of fact on this very narrow issue.  As such, having reviewed the parties' submissions and argument in support of, and opposition to, the within motion for summary decision, **I CONCLUDE** that no issues of material fact exist regarding claims for the 2016-2017 school year and as a result are moot as they were addressed in the October 29, 2015, Settlement Agreement and only issues concerning due process from July 1, 2017 forward are relevant.

### <u>ORDER</u>

It is **ORDERED** that the respondent's motion for partial summary decision be and hereby is **GRANTED.**  It is **FURTHER ORDERED** that this matter be heard on the merits at a hearing on October 4, 2017.

September 28, 2017
DATE

**DEAN J. BUONO,** ALJ